Good morning. May it please the Court, my name is Adrian Martinez and I'm counsel for Natural Resources Defense Council, East Yard Communities for Environmental Justice and Coalition for a Safe Environment. I'd like to reserve six minutes for rebuttal. Okay, watch your clock. This case concerns whether a community can receive the burden of a new project for purported regional benefits. And today I'm going to go over the two regulatory issues that are before the Court. First, I'm going to go over the Clean Air Act arguments that were presented. And then second, I'm going to go over the National Environmental Policy Act. First thing I'd like to... Counsel, when you do that, and I'd ask both counsel to address it, we're familiar with the traffic problems. We all live through them, I'm saying, and I think everybody here is familiar with them. So the question, at least that I have, is under the structure of the Clean Air Act and the necessity of trying to achieve clean ambient air and also deal with the other problems, the myriad of causes that may create ambient problems. We have here a project that ostensibly is designed to create a more efficient traffic flow of these big diesel burning trucks. And they are going, as I understand it, through an area which already has these trucks coming through it, but they're on surface streets, creating some kind of pollution, I assume. And I understand the argument that you all are making about the impact on proximate neighborhoods who may bear the burden. So I've been referring it to maybe not a very nice way of the tail wagging the dog issue, which is if there is an overall improvement by more efficient traffic and removing them from surface streets, but there is a collateral impact on the 150-meter adjacent neighborhoods, if there is such an adverse impact, does it take, say, one neighborhood that would be impacted and the whole project has to be scrapped because there will be undeniable impact of this particular particulate? Is that enough and is that what you're arguing for? Yeah, I think that's a good frame for this argument. And maybe it makes sense to walk through kind of the statutory background and the regulatory background because I think a lot of the questions in this case, EPA has already been asked and answered them. And I think that will illustrate what's at issue in this case, what the Clean Air Act permits and what it doesn't. So the text of the Clean Air Act starts with the conformity provisions, which in relevant part here, a federally supported project can't increase the frequency or severity of any existing violation. And if you're wondering, the addendum in plaintiff's and appellant's opening brief includes that provision at page 4. It might make sense to go along with it because I'll walk through the relevant regulations. So that's on page 4. You're on 7506? 7506, yes. So that's kind of the basic statutory underpinning. Congress provided the direction that can't increase the frequency or severity of any existing violation of any standard in any area. Second, I want to point to an important regulation in addendum 29. And that's EPA's regulation 40 CFR 93.116. And specifically, that's the criteria by which conformity analysis are supposed to be conducted. And we're under the diesel portions? Yeah. This is the 29. It talks about the criteria. It looks at basically in relevant part it talks about no localized violations, which means no new local violations will be created, or the severity or number of existing violations will not be increased as a result of the project. And I think the central regulation in this case is on addendum page 30. And that's 40 CFR 93.123. And there are two parts that I really want to highlight in this regulation. The first is that regulation applies for carbon monoxide, particulate matter 10, or soot, or coarse soot, and then particulate matter 2.5, which is fine soot. It applies to all three. It applies when you're doing different distinctions for qualitative versus quantitative analysis. But in particular, I really want to point out that in 93.123C, there's a provision that's general requirements that applies to conformity analysis for all three. And I think it's important to read that language because I think it's the instructive and central point here. Estimated pollutant concentrations must be based on total emissions burden, which may result from the implementation of the project, summed together with future background concentrations. The total concentrations must be analyzed, must be estimated and analyzed, at appropriate receptor locations in the area substantially affected by the project. And how are those key phrases defined? Appropriate receptor locations and areas substantially affected. Are those defined? So you've hit the test. The test in this case is whether Federal Highways looked at the appropriate receptor locations. Their analysis is a lot on the area analysis they did, saying directionally emissions are going to go down. That doesn't look at the appropriate receptor locations in the analysis. And I think the other important regulatory ‑‑ Where is appropriate receptor locations defined? It's the ‑‑ well, that's the language. I mean, we think it's clear. I mean, what is appropriate? Well, I mean, I think that's the issue in any conformity analysis. But I think the important issue here is for the particulate matter analysis, they haven't identified any receptor locations. Well, they did. They looked at the north Long Beach. Well, so let's go back to the language of 93.123. And the Long Beach data, what that's going to provide is the ‑‑ with future background concentrations. That's what they're talking about. They're using that data to say, hey, this is what the background concentrations are. And then under the conformity analysis, what they're supposed to do is look, as a result of the project, when you add that to the background concentrations, there can't be any violations of the standard. True, but they're under a qualitative analysis, right? Yes, and I think that's one of the big issues in the case, that appellants here aren't asking for a quantitative analysis. We're asking for a qualitative analysis. Didn't they do that? Didn't they do a qualitative analysis? Well, they did a qualitative area analysis. What we're asking for is a qualitative analysis at the particular locations, the neighborhoods most impacted by the project. And I think it's instructive to look at the facts in the record, which show the kind of distinction between the analysis they did for other pollutants and other parts of the analysis and what they did for particulate matter. Although the guidance was directed specifically, in this case, toward the PM2.5. Yes. Not CO. Yes. Well, but I think, and I'll go over the data, because I think the carbon monoxide analysis is instructive, not in the fact that they did a quantitative analysis, but in the fact that they identified appropriate receptor locations. So for the carbon monoxide analysis, they actually looked at intersections, and intersections are important. They've been described throughout the regulatory structure here as the place where the problems exist. In fact, So this goes, is that what you're saying, that you'd look at the intersection in this case, or are you using it by analogy? Those are one of the examples that are included in the regs, the intersection. Is that what you're asking for? That's the neighborhood you're asking for? Yeah, and I think if you look, so the information in the record identifies, I think, three facts that are particularly important for the Court today. The first is that there's going to be a dramatic increase in diesel trucks along the expressway. It's going to increase from about 9,000 to about 18,000. So we're talking about a 9,000, more than 9,000. Does that increase, does that number increase regardless of whether the expressway is built? Well, I think that increases on the alignment of the new expressway. So what that says is it's taking traffic from the area and funneling it into neighborhoods in Wilmington. And I think that's the big issue. If you look at the traffic along that corridor, it's going to be less. Basically, the design of this project is to funnel traffic to these... Get it off the 710 and the 110 and get it on to Alameda. Yeah, and I think we'll get to that because I think that's an important distinction. Just to get a... I'm looking at a map, but... So this comes off the 47 freeway, right? Yeah. And it goes along, it tracks along Alameda? Yeah. And it'll be built for a segment over the existing roadway, Alameda. Yeah, it's going to be an expressway that connects the Schulerheim to kind of the regional hubs where a lot of freight's going. And it's above, basically, Henry Ford. And so I think the... And how long a segment is it? As I recall, it's 1.7 miles. Okay, and where's the intersection that you... Okay, yeah, I think the health risk assessment identifies exactly what receptors or where the problems are located. And in particular, the health risk assessment shows that pollution will increase. I think there's no dispute that in the direct vicinity of the project area, pollution will increase. And the neighborhoods most impacted are Lincoln Village, Dominguez, and parts of Wilmington. Basically, the part of Wilmington with the highest percentage increase is where the basic trucks are going to enter the highway. But I think the relevant point here is emissions are going up in these neighborhoods. And I think that's the important point here. I assume there are emissions already in the neighborhoods because the trucks already use Alameda, but not as many. Yes, not as many directly. And I think the other important kind of factual predicate in the record here is that EPA, when it was devising the conformity analysis, identified that the important area is right next to the highway, within 150 meters. In fact, the agencies themselves have concluded the impact zone for elevated PM2.5 concentrations occurs near the highway. And they did that in Exerts of Record, Volume 3, 708. So they're admitting that the problem is right next to the highway. Now, for carbon monoxide, there's also an increase. So if you look at the evidence in the neighborhoods adjacent to the project, there's an increase in pollution. And I think the important part here is EPA has been asked and answered a very similar question. So in determining whether they did analysis at the appropriate receptor locations, EPA was asked during the 1997 conformity rulemaking, one commenter said, hey, we should allow projects that would potentially increase pollution in an area where no one lives because it reduces pollution in an area where a population resides. And EPA emphatically rejected that. And what they said is the conformity provisions provide clean air to any area. And so what we have is EPA's... Where did EPA say that? Yes, so that is in the 1997 conformity rulemaking. And the site is 62 Federal Register, 43,780. And the PIN site is 43,798. And so it's a different conclusion than here, but the difference is you actually have people living in the area where the emissions are increased. It would be non-sequitur to say it's okay, you can't allow emissions increase in the places where no one lives but still has access to ambient air. But in this precise instance, you have increases where people actually live. So I think if you look at the evidence, in several analysis, in the health risk assessment, in the carbon monoxide conformity analysis, they identified receptor locations. And the evidence also shows that truck traffic and emissions are increasing in the neighborhoods. But when it came to the PM2.5 analysis, they did not look at appropriate receptor locations. They basically wrote that out of the regulation, 93.123, which says at appropriate receptor locations in the area. They just did the area-wide analysis. And I think that's the important here. Receptors have been identified, but and the evidence shows an increase in pollution in the neighborhoods, and they refused to look at that evidence. And that's what the conformity. You make that both as a CAA and a NEPA violation. Yeah, and so the NEPA, and I guess now what makes sense to, and then I'll sit down for a second unless there's more questions. The NEPA violation is they didn't look at the potential violations in the neighborhoods. They relied on this area-wide analysis. And what NEPA's... Is there anything that prohibits them from approaching it that way? In NEPA or the Clean Air Act? Well, the Clean Air Act and NEPA. Yeah. Well, the Clean Air Act, I think the big issue is did they identify and do the analysis at appropriate receptor locations, which applies whether you're doing a qualitative or quantitative analysis. They have not done that here. That's EPA's direction on conformity, and they failed to comply. On the NEPA analysis, the importance is NEPA is around to identify mitigation. Unless they identify the impact of potential violations in the neighborhoods next to the highway, they can't craft the appropriate mitigation to protect those communities when they're gardening or when their children are walking down the street. With that, I'll reserve the rest of my time unless there are more questions. All right. Thank you. Judge Noonan? No, no questions. Good morning. I'm Dave Gunter from the Department of Justice here on behalf of the United States. With me at council table is Brett Gaynor from the Federal Highway Administration, and we also had assistance from attorneys at EPA in preparing this case. I'm going to spend 14 minutes talking about the Clean Air Act conformity determination that the Highway Administration did, and I'm going to turn it over to Ms. Thompson to discuss the NEPA analysis that the state agencies did. The SR-47 expressway is a needed infrastructure project that will improve traffic circulation around the two largest container ports in the United States. But before releasing federal funds for that project, the Highway Administration had to do a conformity determination, had to ensure that the project won't make air quality worse in the area that it substantially affects. And the record here has that. It shows. So let me just ask you the question so I know what you accept as the baseline. If, in fact, there were a receptor placed within 150 meters of the intersection or whatever is the appropriate receptor area, as the plaintiffs have argued for, and it shows that there would be an increase in that area, albeit the overall project area, the substantial reduction, is that enough to kill the project? No. What you're describing is a quantitative analysis where you place a receptor at a location and identify an estimated future pollutant concentration at that location if the project is built. Let me jump right into Section 93.123, which contains that appropriate receptor location language. The court will see that it refers to estimated pollutant concentrations and how estimated pollutant concentrations are calculated at a particular point. That's a quantitative requirement. This is in the general requirements section because it applies to CO conformity determinations. It applies to PM10 conformity determinations. It applies to PM2.5 conformity determinations. if the tools are available to analyze those issues on a receptor-by-receptor basis. And so this tells you where the receptors have to be, appropriate receptor locations. Isn't the place that would be most affected by the pollution the most appropriate place to measure? Well, the appropriate place to measure is within the area substantially affected by the project. Right, and we have a problem with how do we define that? What is that area? The answer on how to define that is in EPA's regulations. EPA defines it essentially to the locations with which we have the tools to measure. And at this time, in 2006, when it promulgated these conformity regulations, EPA included an exception in 93.123B that said, until we have approved a model and released guidance about how to do quantitative analysis, only a qualitative analysis is necessary within the area substantially affected by the project. The rules are different now because in 2010, a quantitative guidance was released. And, Judge Wardlaw, you asked where the regulations defined what appropriate receptor locations are. The answer is in that quantitative guidance that did not apply at this time. So what the plaintiffs are trying to do is import quantitative requirements that came online later after EPA had approved a model into the qualitative analysis that was required at this time. Now, instead, what was required at this time was a qualitative analysis of local factors. And the record has a deep well of information about what those qualitative local factors are, including a traffic study, an air quality impacts technical study, and a health risk assessment. Those analyze issues such as how many vehicle miles traveled will there be in the area with and without the project. The answer is vehicle miles traveled will go down. How much emissions will there be of each of the various pollutants if the project is built versus not built? The answer is all pollutant emissions will go down in the broader area affected by the project. And so those are the data that form the basis for the conformity determination qualitative analysis here. The best place to see this is in excerpts of record 330 to 333. Now, NRDC claims that appropriate receptor locations have been identified in the human health risk assessment. But both the EIS and the health risk assessment state there has not been an appropriate model approved for use for this kind of analysis. So the health risk assessment was commissioned specifically to answer community concerns. But the authors of that study caveated it repeatedly by saying this is not what this kind of aerial dispersion model was designed to do. Let me make one additional point about 93.123 and the general requirements that apply to conformity determinations. You'll see a similar regulation at 93.101 which defines hotspot analysis. Hotspot analysis assesses impacts on a scale smaller than the entire non-attainment or maintenance area. That certainly is true here. The entire non-attainment area is Los Angeles County. And so the study that was done reflects a study at a much smaller scale than that. But it also says that hotspot conformity analysis uses an air quality dispersion model to determine the effects of emissions on air quality. There's no dispute that that's not required here. That is a quantitative requirement. And we all agree that only qualitative analysis is necessary here. But what this regulation shows is that the hotspot conformity regulations contain some general requirements that apply to all pollutants in most cases but that are within the exception of Section 123B for qualitative analysis of PM2.5 before a guidance is released. That exception exempts PM2.5 analysis from a number of requirements throughout 40 CFR Part 93 until that guidance was released. And it was released in 2010, not in time for this analysis. So what NRDC is trying to do is stop the construction of this highway based on what they think will happen at these receptors immediately adjacent to the highway. Even though EPA has said that at the time of this conformity determination, we don't have the tools that we need to make that analysis. Now, it's been referred that there's a Method A and a Method B option, and this came under Method A. Was that all part of this alternative to quantitative analysis? Yes. The qualitative guidance identifies some ways, although it's not an exclusive definition that a qualitative analysis could be done. One of those is comparison to another receptor location. So try and find an area similar to the area you're analyzing and use a monitor there to inform your analysis. Here, that's what the agency did. It used the North Long Beach Monitoring Station to understand ambient air quality within the area substantially affected by the project. But we don't have a comparable receptor for that point immediately adjacent to the highway. There was another one closer to the Pacific Ocean. And they chose the North Long Beach, as I understand it, because it was more likely to, even though it's five miles away, be closer to what the conditions would be in the true area? That's right. And in looking at those ambient air conditions, you're looking not just at number of vehicle miles traveled or amount of pollutant emitted. You're also looking at concentrations. So not just how many pollutants are emitted, but how long do they stick around before they're dispersed, for example, by the winds. And so the agency looked at those comparable monitors, trying to find one that would be most like ambient air within the project area here. Then, using that as its starting point, it applied those qualitative factors, like the fact that congestion in this area will decrease. Vehicle miles traveled will decrease. And the highway is going to be 40 feet elevated in the air, where the winds will more easily disperse these pollutants than it would if they were on the ground. In fact, surface traffic along the existing Henry Ford Avenue is expected to go way down as a result of this, because the trucks will not have to go along those surface roads anymore and wait at the traffic lights and wait for the railroad crossing. This is about a 1.7-mile segment. Is that what you're referring to? That's right. And obviously, on that alignment, there will not be any additional intersections or railroad crossings, as there are now. Where level of service at intersections is expected to worsen slightly is to the north of the new expressway, where those trucks move on to Alameda Avenue, which has recently widened and would connect the SR-47 expressway to the east-west running expressways to the north of the ports. And the EPA's involvement in this was they participated in defining the study area? EPA didn't participate in defining the study area, but its regulations provide that cause or contribute to a new violation, the operative language from the Clean Air Act means to cause or contribute to a new violation within the area substantially affected by the project. That's in 93.101. So I think that we all agree, the parties agree, that EPA's regulations control this analysis. Well, I just want to know, you said you're representing and you've talked to EPA people, and one of the things we're doing here is interpreting EPA regulations. My question is, is EPA's position in this litigation that the arguments you're making are consistent with the regulations that they've issued? I can tell you that the arguments in the brief we filed, EPA reviewed and agrees with. Now, I should be precise here because EPA wasn't formally involved in the conformity determination itself, and that was the Highway Administration's decision. So are you saying lawyers at the EPA read the brief and accepted the brief? Yes. I'm here on behalf of the United States, including both Highway Administration and EPA, and I'm giving you the United States position. But even in the administrative record, EPA also participated, not by setting the study area, but by commenting on the conformity analysis that was done. And you can see that EPA submitted extensive comments on the conformity analysis, made several comments of how to change things in the final EIS, appreciated, for example, the fact that the agencies attempted a health risk assessment, but didn't say anything about whether appropriate receptor locations were adequately analyzed, whether the agencies had correctly identified the area substantially affected by the project. EPA had a chance to review those issues in the administrative record and passed on them in the administrative record. And so the court can read those comments. All right. And the guidance that is governing this, that's a joint product of EPA and the Highway Administration? Yes. I believe that's right. The 2006 guidance. The regulations are promulgated by EPA with the concurrence of the Highway Administration, but I believe that the guidance is actually the quantitative guidance. I'm talking about the qualitative. Right. The qualitative guidance is joint. Yeah. It is a product both of EPA and of the Department of Transportation. Okay. Unless the court has further questions, I will turn the podium over to Ms. Thompson. All right. Thank you. Thank you. Good morning, Your Honors. I'm Jocelyn Thompson representing Alameda Corridor Transportation Authority, and with me at council table is Judith Carlson of Caltrans. I would like to concur in all the statements of Mr. Gunter this morning. I will be speaking on behalf of all the appellees regarding NEPA compliance. And then NEPA arguments here fail for several reasons. First, they're derivative of the Clean Air Act and conformity determination arguments. So as Mr. Gunter has explained, appellants' arguments there fail, and so to the extent that the NEPA arguments are based on what happened in the conformity analysis, they fail within NEPA as well. And it goes the other way as well? It's not necessarily. Not necessarily. Because even if you conclude that the conformity analysis was for some reason inadequate, the case law shows that NEPA and the Clean Air Act conformity programs are not inextricably bound and that you can comply with NEPA even if the analysis does not meet the Clean Air Act conformity requirements. So in that case, we would then take a closer look at whether the analysis satisfies NEPA independently. And there's certainly case law that says that in the NEPA context, a qualitative analysis is adequate as well. The obligation is on the agency preparing the EIS to explain why objective quantitative data is not available, and that was the decision in League of Wilderness Defenders. But so long as the agency has adequately explained that, then it is entitled to proceed with a qualitative analysis. Let me actually jump to I think what troubles, at least it troubles everyone that I've spoken to in preparing for this case, which is if a quantitative analysis was done for the health risk assessment in the NEPA context, why can't we just import that into the conformity determination? What would be the harm? That's a good question. Yes, so the harm is this. There are two different programs with two different purposes and two different methodologies. And first, you can't mix and match, as the appellants have done, because it's like trying to create a garment out of a sleeve of an infant sleeper and a man's suit and a bodice of a ball gown and a clerical collar, and you can stitch them together, but you don't have a functional tool. In this city, I wouldn't say so. Okay, I'd wear it on Hollywood Boulevard at Halloween, but I cannot wear it to court. It's just not going to be a functional garment. And the same occurs here when we're talking about all of these different methodologies. They're analytical tools, and years are spent trying to develop the appropriate analytical tool. So when ACTA decided to prepare the health risk assessment, it still was limited by the tools available, and it explained in great detail why one can't draw absolute conclusions from the results of this analysis, and they're best used to compare one alternative to another. But it set that aside. It said we're going to use these tools anyway, because our aim is in the health risk and cancer exposure context to protect the public health, and that's our highest aim. So we are going to use a methodology that overstates risk. It overstates impact. And in the context that it was done, which is under the California Environmental Quality Act, that worked for them. It worked for them because at the end of the day, under CEQA, the California Act, if the analysis shows a significant impact, the approving agency must incorporate mitigation and then can proceed with the project, and that is what was done here. So there was a very, there were very few spots where there was concern about cancer risk if someone sat at that location for 70 years without moving. And ACTA said, we'll do it anyway, and we will protect them. But if you import that sort of philosophy into the conformity determination, you reach a very different outcome, because the conformity rules would preclude a project from going forward if it is showing an increase in frequency or severity of the ambient PM2.5. The project cannot proceed, and as EPA amply explained in 2006, the problem with the tools are that they can reach the directionally wrong answer. So it's not just whether the tool comes up with 10% or 11% increase. It's whether there is an increase or a decrease. And EPA identified this as a weakness at that stage of the development of these tools in precisely the circumstances that we're talking about here, in situations where the number of vehicles will increase, but the congestion will decrease. And so you have smoother flowing traffic and higher speeds, all of which go to reducing pollutants. Appellants said that there's no dispute that emissions will increase, and that's not correct. There is absolutely a dispute about whether pollutants will increase. They take these overstated assumptions in the health risk assessment and say, see, we're going to conclude that PM10 will increase as well. And that is where the mismatch occurs. And if you follow their path and you stitch together this garment, you will end up in a situation where a project that is positive and beneficial from an air quality perspective, not only regionally, but also at these locations, at these intersections, it will be abandoned because of a false positive. That is precisely what's going on here. You cannot mix and match the tools. If ever there was a case that called out for deference to the expertise of an agency, it is this one, because it draws on the expertise dealing with atmospheric sciences, with modeling tools, with traffic analysis, with the chemistry of air pollution, with the flow of traffic on surface streets versus highways and how speed and congestion affect all of these variables. And I can say that I can read appellant's brief and see that they tell you 20 times that the truck traffic will double at these intersections, but they only cite the record once, and I cannot confirm their numbers when I go to that page. With respect to the emissions, they claim doubling emissions. Sometimes they claim the emissions are more than 100 percent more, even when there's a 100 percent increase in the trucks, and they do not cite the record. The record does not show that. The record shows that at these very intersections that they're concerned about, congestion will decrease. At some, the vehicle counts will increase when you combine the two layers of traffic, the surface streets and the elevated freeway. The numbers of vehicles combine, but because of the free flow of traffic, the emissions will decline. Does the court have questions? No, thank you. Thank you. Could I ask you a question about NEPA? Yes, yes. I'm sorry I gave that short shrift. If I understand that you relied on data that was out of date, and why is that a problem? Weren't you using data that went back to 1997 on the CM 2.5? I'm sorry, I didn't. Did you not rely on 1997 data in determining the air quality? No. The data that was used was more recent than that, but there were trends that were evaluated as well. The other thing that – I'm sorry, I'm going from my bench memo. Caltrans relied on outdated CM 2.5 sites to ER 330. I'm sorry, it's sites to ER? 330, which is to an EIS prepared in 2009, acknowledging a 2006 update. I think that there is a little bit of confusion. Yeah. Caltrans did not rely on 1997 data. Appellants claim that Caltrans was judging this case vis-à-vis a PM 2.5 standard that was adopted in 1997. And appellants claim that Caltrans did not look at the new standard that was adopted in 2006. That is not correct. If you look at the final environmental impact statement, it discusses the 2006 standard. The 2006 change did not change the peak exposure, the 15 – I'm sorry, it did not change the annual exposure, which was what was most at issue with the carcinogenic impact. That remained at 15 micrograms per meter cubed. It changed the 24-hour standard. So what is the 24-hour average? And that was reduced from 65 to 35 micrograms per meter cubed. But this was where it came out at the end of the day. Both standards have been discussed extensively in the record. And when the project is reducing emissions, for NEPA purposes, it doesn't matter whether you're comparing it to 65 or 35. The project is reducing emissions. And that's all you really need to know. Anything else? Okay. Thank you. I have a lot to go over, but I'll be quick. The first thing I want to note is that the federal agencies are rewriting the regulations at argument. The regulations 93.123C was present in 1997 conformity rules. It remained the same in 2006. There's no indication that the at appropriate receptor location is different for qualitative or quantitative analysis. That's EPA's regulations. And under the Clean Air Act, DOT, or Department of Transportation, needed to concur with that. They concurred with that. So their explanation of how the appropriate receptor location doesn't apply is just not, they can't rewrite regulations at argument. There was some discussion about EPA's involvement. I mean, I don't know if, I guess EPA's lawyers may have looked at it. But EPA did weigh in, and they weighed in that local impacts for this project are the primary concern. And we addressed that on page 24. Is that in the EIS? That was in the comments on the EIS, yeah. The other thing on the text of 40 CFR 93.101, the definition of hotspot, counsel conveniently ignores a pretty relevant statement in that regulation that talks about, for example, congested roadway intersections. And I think that's important, because the issue about intersections is whether it's relevant evidence. The record concedes that intersections are relevant evidence. The agency determined that study area intersections were chosen because of the potential to be impacted by the project. Accordingly, they are the intersections where a NAAQS, or particulate matter standard, or carbon monoxide violation is most likely to occur. The agency further determined that these intersections are relative to qualitative PM 2.5 analysis. And that's in the excerpts of record, volume three, page 702. So intersections are relevant. They were relevant for the carbon monoxide analysis. They're relevant for the health risk analysis. They're relevant to identify the appropriate receptor locations. Those are the locations where the project emissions are getting worse. Now, on the doubling of, or the increase in truck traffic, that would have been an appropriate issue for council to raise in the reply brief. But the evidence in the record, which we cite, does show it is in the form of a traffic model. So it may be difficult to understand the maps. But it does show that there will be an increase in diesel truck traffic along this expressway. If there weren't, why would they be building it? The purpose of this project is to funnel traffic through this area. Otherwise, there would be no need for this project. And then the final issue I want to address is this. They could have done a qualitative analysis here. The issue, the- Wait, quantitative? A qualitative analysis here. Their analysis says- I thought that's what they did, a qualitative- Well, a qualitative analysis at the appropriate receptor locations. Okay. They just did a qualitative analysis of area-wide emissions. Which would have been where? Which would have been at the intersections identified. There were several intersections identified where the conditions got worse. We see that in the carbon monoxide analysis. You see it in the actual PM2.5 analysis. Conditions get worse at certain intersections. So on one hand, the agency focuses on the intersections where things are getting better and ignores the intersections where issues are getting worse. They've conceded that intersections are the likely places where NAAQS violations are going to occur. And that would be the intersections in the immediate vicinity of the project and the neighborhoods around the project. That's what the hotspot analysis is for. I think that's the- It's not called a hot area analysis. Now, I like the argument about the clothes because in this analysis, they're weaving together clothes for the entire area, but the one area that's naked is the project area, the neighborhoods right adjacent to the expressway and at the intersections where issues get worse. They're not protected in this scenario. Leaving it up to visualize where the naked area may be. That's a way to close. That I will submit. Thank you. All right. Thank you very much. NRDC versus DOT and Caltrans is submitted.
judges: Noonan, Wardlaw, Fisher